IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JOHN SCHREIBER,<br><br>        Plaintiff,<br><br>v.<br><br>INFOARMOR, INC. d/b/a ALLSTATE IDENTITY PROTECTION,<br><br>        Defendant. | Civil Action No.: _____ |

## COMPLAINT

Plaintiff, John Schreiber ("Plaintiff" or "Schreiber"), by his attorneys McCarter & English, LLP, for his Complaint against defendant, InfoArmor, Inc., now doing business as Allstate Identity Protection ("InfoArmor or "Defendant"), hereby states as follows:

## SUMMARY OF CASE

This is an action for breach of contract. On August 26, 2018, Schreiber accepted a written offer of continued employment with Defendant in connection with the acquisition of InfoArmor, Inc. by Allstate Non-Insurance Holdings, Inc., memorialized in a fully executed Retention Award Letter Agreement (the "Retention Agreement"). As set forth in the Retention Agreement, in order to incentivize Schreiber to continue in his employ subsequent to the acquisition, Schreiber was presented with the opportunity to receive a cash retention award with a target value of $3,000,000, which amount is referenced in the Retention Agreement as the "Target Retention Amount." The Retention Agreement covers the two calendar years for 2019 and 2020 and contains provisions addressing an early termination of Schreiber's employment. The Retention Agreement specifically states, in relevant part, "if your employment terminates prior to the expiration of an Applicable Performance Period …[due to] a termination by the Company without

1

Cause,… you will be entitled …to receive the Target Retention Amount (less, the First Retention Award Amount to the extent previously paid), without regard to the actual level of EBITDA or Revenues achieved, payable on the first payroll date following the effective date of such release." On June 26, 2020, Defendant terminated Schreiber's employment without Cause, thereby entitling Schreiber to the contractual payout of the Target Retention Amount of $3,000,000, as no amount was paid in connection with the First Retention Award Amount. Defendant has refused to pay the Target Retention Amount or any part thereof.

## THE PARTIES

1. Schreiber is an individual residing at 1127 Cuchara Drive, Del Mar, California 92014-2623 and is a former employee and shareholder of InfoArmor, Inc.

2. InfoArmor conducts business under the name Allstate Identity Protection, and is a subsidiary of The Allstate Corporation ("Allstate").

3. InfoArmor is incorporated in the State of Delaware with its principal place of business located at 7350 N. Dobson Road, Suite 101, Scottsdale, AZ 85256.

4. InfoArmor employed Schreiber as its Chief Executive Officer until it terminated his employment without Cause on June 26, 2020.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over Defendant pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and the parties are citizens of different states.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) because the Defendant resides within the jurisdiction of this District.

7. Furthermore, jurisdiction and venue are proper in this Court because the Retention Agreement expressly provides that "any legal action or proceeding related to [the Retention Agreement] will be brought only in the state or federal courts located in the State of Delaware."

## FACTUAL BACKGROUND

### A.   The Acquisition Of InfoArmor

8. In the Spring of 2008, Schreiber became an investor and board member of InfoArmor, an Arizona-based company that offered privacy management and identity protection services.

9. Schreiber was appointed as the Chief Financial Officer of InfoArmor in October 2008, and then served as its President and Chief Financial Officer from 2009 through 2016, and its Chief Executive Officer from 2016 through 2020.

10. On October 5, 2018, Allstate Non-Insurance Holdings, Inc., a holding company for Allstate, acquired InfoArmor, Inc.

### i. Allstate Offers Schreiber The Retention Agreement.

11. In connection with its acquisition of InfoArmor, Allstate sought to ensure that certain highly valued executives, including Schreiber, remained employed with InfoArmor.

12. On August 26, 2018, Allstate offered Schreiber the Retention Agreement to encourage his continued employment with InfoArmor in exchange for a cash retention award.[1]

13. Pursuant to the Retention Agreement, Schreiber was eligible to receive a cash retention award, with a target value of $3,000,000 (the "Target Retention Award"), in accordance with the terms and conditions set forth therein.

14. The Retention Agreement encompasses calendar years 2019 and 2020 and contained provisions addressing an early termination of Schreiber's employment.

15. The Retention Agreement provides that "[a]s soon as practicable following the end of each Applicable Performance Period, Allstate [would] determine the EBITDA and Revenues achieved in respect of such Applicable Performance Period and the First Retention Award Amount or Second Retention Award Amount, as applicable (the date of such determination being, the "Applicable Determination Date")."

16. The Retention Agreement provides in relevant part that "if your employment terminates prior to the expiration of an Applicable Performance Period (i) due to… a termination by the Company without Cause, … you will be entitled, subject to your execution (other than in the case of death) of a general release of claims in favor of Allstate and the Company (in a form reasonably acceptable to Allstate) that becomes

---

[1] A true and correct copy of the August 26, 2018 Retention Agreement is not attached because it is potentially subject to a confidentiality provision.

effective within 60 days following such termination, to receive the Target Retention Amount (less, the First Retention Award Amount to the extent previously paid), without regard to the actual level of EBITDA or Revenues achieved, payable on the first payroll date following the effective date of such release."

17. The Retention Agreement defines "Cause" to mean (a) gross negligence or willful or intentional misconduct in connection with the performance of your duties, or your willful or repeated failure or refusal to perform your duties; (b) embezzlement or fraud committed by you, at your direction, or with your prior actual knowledge; (c) your misappropriation of any assets or business opportunities of the Company or Allstate; (d) conduct by you that is detrimental to the Company's or Allstate's reputation, goodwill or business operations in any material respect; (e) breach or threatened breach by you of any applicable restrictive covenants; or (f) your conviction for, or plea of *nolo contendere* to, a felony or any crime involving moral turpitude.

18. Defendant has claimed that Schreiber engaged in "willful or intentional misconduct in connection with the performance of [his] duties".

> ii. **Allstate Altered InfoArmor's Post-Closing Business Strategy And Inhibited Schreiber's Ability To Meet The Target Retention Amount.**

19. On October 5, 2018, the parties closed the acquisition of InfoArmor.

20. After closing, Allstate substantially changed InfoArmor's business strategy.

21. InfoArmor determined that the change in business strategy completely undermined Schreiber's opportunity to meet the targets set forth in the Retention Plan.

22. In October 2019, Schreiber and Allstate Vice Chairman Steve Shebik ("Shebik") began to renegotiate the terms of the Retention Agreement based upon Allstate's recognition of its changed business strategy.

23. On May 20, 2020, Schreiber and Shebik completed the renegotiations of the Retention Agreement.

24. The agreed upon revised terms included fixing several errors in the original Retention Agreement; mandating a payout in the amount of approximately 43% of the 2019 retention pool; removing the financial goals from the 2020 retention pool and replacing them with key performance indicators; and re-instituting financial goals as a portion of the 2021 calculation, as dictated by the yet to be submitted 2021 financial plan.

25. On May, 31, 2020, Shebik officially retired and was replaced by Don Civgin ("Civgin").

**B.    Defendant Abruptly Terminated Schreiber's Employment Without Cause.**

26. On June 26, 2020, after having reached the final stages of negotiating an amended Retention Agreement, Defendant abruptly terminated Schreiber's employment, claiming "Cause" in order to avoid its obligations under the Award Letter.

27. In support of Schreiber's for "Cause" termination, Defendant cited to an internal investigation it conducted in June 2020 wherein it claimed to have found alleged accounting improprieties that it attributed to Schreiber even though his conduct in no way provided the impetus for the internal investigation.

28. The investigation conducted by Defendant focused on three areas: timing of recognition of receivables as uncollectable and bad debt reserve building; shifting of expenses from one period to another; and cost center allocation.

ME1 34143301v.1

29. In each of these areas, Defendant improperly inferred Schreiber's culpability absent any direct evidence and failed to consider, or chose to disregard, materiality, the reasonable judgement and discretion permitted and employed during the decision-making process, and the lack of any incentive by Schreiber to approve improper accounting.

### i. Bad Debt Reserves/Collections.

30. Defendant erroneously faulted Schreiber for what it claimed to be insufficiently building bad debt reserves and for a declining collections process.

31. With InfoArmor's strategic push into the small and medium sized business market after the acquisition, it was expected that receivables would rise relative to revenues by the very nature of the change in client mix.

32. However, InfoArmor was operating with an immature billing system and an unsophisticated collections process overly reliant on entry level personnel.

33. Through 2019 and early 2020, Schreiber exercised his discretion to first attempt to improve the collections process and then make the decision on what, if any, additional bad debt reserve building and write-offs were appropriate.

34. The ultimate determination was delayed by the unexpected resignations of the two accounting employees, resulting in an unforeseeable loss of collections personnel.

35. Due to these unforeseeable circumstances outside of Schreiber's control, InfoArmor's Chief Financial Officer continued to build bad debt reserves while also attempting to improve the collections process.

36. Shortly thereafter, in March 2020, InfoArmor was unforeseeably impacted by the COVID-19 pandemic, which prompted Civgin to explicitly instruct Schreiber to continue building bad debt reserves.

### ii. Shifting Expenses

37. In or around December 2019, Neil Hunt, one of the accounting employees who resigned, advised InfoArmor's President to shift expenses from the first quarter of 2020 to the fourth quarter of 2019 by purchasing $2,500 in gift cards in the fourth quarter of 2019 that were then redeemed in the first quarter of 2020.

38. During the time period in question, InfoArmor was approaching a $100M revenue run-rate.

39. Purchases in the amount of $2,500 were well below financial controls requiring Schreiber's approval.

### iii. Cost Center Accounting

40. Schreiber was not responsible for any purported errors in InfoArmor's cost center accounting.

41. During the time period relevant to this matter, Allstate conducted several financial audits of InfoArmor that resulted in no material findings.

42. In the Spring of 2018, Ernst & Young performed a "pre-audit" as part of InfoArmor's preparations to market itself for a potential sale.

43. In the Summer of 2018, BDO conducted a regular annual financial audit resulting in no material findings.

44. In the Fall of 2018, a separate audit team from Ernst & Young performed a due diligence audit for Allstate in conjunction with the acquisition of InfoArmor.

45. In the summer of 2019, another annual financial audit was conducted of InfoArmor resulting in no material findings.

46. Despite no material adverse findings in any of these financial audits, Allstate now seeks to hold Schreiber accountable for purported errors in the cost center accounting that even if made, were neither made willfully nor intentionally.

47. Allstate has not provided the basis for its claim that Schreiber actually committed any such errors, and given the negotiated changes to the Retention Agreement there was no personal incentive for him to have engaged in any of the intentional misconduct being wrongfully attributed to him.

C. **Defendant Owes Schreiber Substantial Sums Due To The Termination Of His Employment Without Cause.**

48. For the reasons set forth above, Defendant cannot establish "Cause" for Schreiber's termination.

49. The Retention Agreement specifically states, in relevant part, "if your employment terminates prior to the expiration of an Applicable Performance Period… [due to] a termination by the Company without Cause…you will be entitled…to receive the Target Retention Amount…without regard to the actual level of EBITDA or Revenues achieved, payable on the first payroll date following the effective date of such release."

50. No amount has been paid in connection with the First Retention Award Amount and therefore, Schreiber is entitled to the full $3,000,000 Target Retention Amount as set forth in the Retention Agreement.

## COUNT ONE
### (Breach of Agreement against Defendant)

51. Schreiber repeats each and every allegation of the claim set forth in paragraphs 1 through 50 above as if fully set forth herein.

52. The Retention Agreement constitutes a valid and enforceable written contract between the parties.

53. Schreiber fully performed his obligations under the Retention Agreement.

54. Defendant did not fulfill its contractual obligations under the Retention Agreement by failing to pay Schreiber $3,000,000, the Target Retention Amount, when Defendant terminated Schreiber's employment without Cause.

55. The actions of Defendant breached the Retention Agreement.

56. As a result, Schreiber incurred damages in the principal sum of $3,000,000.

57. Accordingly, Schreiber demands entry of judgment against Defendant for the principal sum of $3,000,000, plus pre-judgment interest and such other relief as this Courts deems equitable and just.

WHEREFORE, Plaintiff Schreiber respectfully requests judgment against Defendant in the principal sum of $3,000,000, plus pre-judgment interest, costs of the suit, and such other relief as this Court deems equitable and just.

DATED: September 2, 2020

        Respectfully submitted,

        **McCARTER & ENGLISH, LLP**

By: /s/*Michael P. Kelly*
    Michael P. Kelly. Esq. (#2295)
    Alexandra M. Joyce, Esq. (#6423)
    Renaissance Centre
    405 N. King Street, 8th Floor
    Wilmington, DE. 19801
    T: 302-984-6300
    F: 302-984-6399
    mkelly@mccarter.com
    ajoyce@mccarter.com

*Of Counsel:*

Craig Bonnist, Esq.
**McCARTER & ENGLISH, LLP**
One Canterbury Green
201 Broad Street
Stamford, CT 06901
T 203.399.5900
F 203.399.5800
cbonnist@mccarter.com

*Attorneys for Plaintiff John Schreiber*